Council will correct me but I'm Russell DePalma. I represent Bo Galyean. And this appeal is not dealing with national securities regulations that impact billions and billions of dollars in investments, but it does impact Mr. Galyean to a great deal. It involves the ownership of two stallions in an oral partnership. Mr. Galyean and Mr. Guinn agreed to purchase, that Mr. Guinn would purchase two different stallions at two different points in time. One stallion is Metallic Rebel, the other one was Rolls Royce with a stylized Z at the end of the rolls. These are cutting horses. They're competition horses. Mr. Galyean is a Hall of Fame rider and trainer of these horses. He was providing his name, his sweat equity, his training skills for this partnership. The partnership had specific clauses in their agreement. First, Mr. Galyean would train and show the horses at these various cutting horse competitions and he would retain 50% of any prize. Mr. Guinn would get the other 50%. Mr. Galyean would also set up, coordinate, and endeavor to aggregate breeding opportunities for the horses. Stallion owners obtain breeding fees from the mare owners for the stallions to breed with the mares. Counsel, all of this, the clauses you talk about, we're talking about an oral agreement, yes? Yes. Again, in Texas, meeting of the minds is a factual issue. The jury was specifically asked about meeting of the minds on both of these clauses. Let's go to the jury verdict because I think if I'm reading the case correctly, the jury found there was a contract. The jury found some terms of the contract. Yes. The real question, though, is in this question two that the jury answered and then the district court answered differently. That is, was this performable within a year? Right. The jury says yes. The court said no, but it appears to me that this was an advisory question, advisory verdict only. What is your position on that, first of all? Is it advisory or was it not? Second of all, assuming whatever your answer, what is our standard of review of what the district court's opinion was? That's the crux of the case. Of course. I believe that it is corrected as advisory. If it's advisory, the district court didn't owe the jury verdict any deference as to that finding. Correct. However, the fact that the district court found otherwise, contrary to what Appellee has said in its brief, the fact that the district court found otherwise does not gain deference because the statute of frauds and the application thereof is still a question of law, which the court reviews de novo. Merely because of the court's findings that underlie its application of the statute of fraud, aren't we going to defer to the district court clear error? That would be for factual findings, but this isn't necessarily a factual . . . this becomes a legal finding. It becomes mixed. Let's unpack that a little bit. Sure. Because it's very interesting. I read the district court's opinion. The district court takes the terms that Judge Vitter referenced and that you began discussing and plopped it right into the opinion. In other words, the 25 percent for, I guess . . . The breeding, yes. The 50 percent for show earnings. Those things that the jury found, the court gave deference to it and said, here are the facts. Your client is traveling under this idea that, well, the courses could have been sold. Yes. That was not a term. The jury didn't find that term, correct? The jury was not asked. The jury implicitly found that term. Where did they implicitly find it? Lost profits. That's the 25 percent. The lost profits, the damages, the money that Galleon otherwise would have received under the contract if it hadn't been breached. Is the district court bound by an implicit finding? It's bound by . . . let me back up to say where the district court should and should not be bound by. The district court should be bound by what's actually in the record and where it made a clear error. Where it made a clear error is on, in its memorandum opinion, the district court specifically says in two places that Bo Galleon's testimony regarding the sale clause of the contract, the 25 percent of net profits that he would receive upon sale of the horses was uncorroborated. Bo, the district court . . . let's back up even farther. The district court said there was no term in the contract about the sale of the horses and, in fact, the record went the other way, that the horses would never be sold. Right. The district court . . . That's a fact finding by the district court, correct? And we owe it clear error review. I don't think that the horses would never be sold would be a fact finding by the district court. Why not? Because, first, again, it's against the record itself. The record itself says specifically that Bo Galleon was the only evidence of this term, the sale term. That is incorrect. The evidence that corroborates the sale term comes from Jody Galleon and Thomas Gwynn. His father and his brother? His father and Mr. Gwynn. But to that point, the trial court heard these witnesses, judged their credibility, and said you've got your client, Mr. Galleon, and a family member who testified to this. It appears from the trial court's opinion that he did not find them credible on that respect. The trial court's opinion said flat out that it was uncorroborated. Well, but the court . . . What is . . . The court said more than that. I'm looking at pages 9 and 10 of the opinion. Of course, what the court says is these conflicting terms, both of which were alleged by Galleon, are a perfect example of why the statute of frauds is necessary. And, again, the court's grappling with the evidence that, as Judge Fitter said, heard the witnesses, considered it in toto, and said there's no evidence here that they had a meeting of the minds with regard to the sale of the horses. But again, on page 9 of that memorandum of opinion that you're reading, he says flat out, Galleon's testimony regarding the sale clause is uncorroborated. That is a clear error finding. Did I hear you say that Gwynne also corroborated this? Gwynne gave . . . Jody Galleon got his information from Gwynne. If Jody Galleon got his information from Gwynne, that's admission of party opponent. Admissions of party opponent are not hearsay. The reason they're not hearsay is very simple, because we credit what the other side says that would be harmful to its case. But Mr. Gwynne did not testify to that at trial. No, he did not. He testified differently. Yes. Only Mr. Galleon's brother testified. Father. Yes, that he got that information directly from Mr. Gwynne. That's not . . . You're calling that an admission? Is that what you're saying? If Mr. Galleon is testifying regarding what Mr. Gwynne said, yes, what Mr. Gwynne said is an admission. It's admission of party opponent. And again, the district court can't say it's uncorroborated when there's specific testimony that corroborates an exact point. That's a clear error. When you have these terms in agreement, that's not an evaluation of credibility. That's an evaluation of what is actually in the record, saying it's uncorroborated, meaning it's not there. Wasn't there evidence, though, also, that the horses were never going to be sold? There was intent by the parties that they were not going to be sold because they wanted to . . . But, I mean, I'm talking about evidence. There was testimony, there was evidence that the horses were never to be sold. I think that's over-reading it, Your Honor. I think what you're talking about is that there was no intent to sell them at the time that they made the oral contracts to obtain the horses. Well, your client built this $300,000 facility to stud the horse, right? Yes. And had the horses for years. Yes. So . . . Having the horses for years doesn't mean that at the time of contracting, which is when you measure whether or not the statute of frauds applies and whether the contract can be performed within a year, that having the horses for years doesn't mean that the statute of fraud applies. What do you say the purpose of the agreement was? Purpose of the agreement, well, partially what Mr. Gwinn said was to have competition horses that could win. He said that on . . . that's on page 14, 724 and 14, 732 of the record. And that be accomplished within one year? Yes. In fact, it was. Metallic Rebel was winning and performing well at competitions within a year. Could it have been accomplished within the year of when the oral agreement took place? That's the year we're talking about? Yes. Yes. Because Metallic Rebel at that time, these weren't foals and they weren't colts. There were three-year-old stallions that were purchased. They weren't purchased as newborns. But isn't it true, though, that they started competing at basically age three, right? Yeah. They go through training starting at age two. It's very intense training to be cutting horse. So they start competing at age three. They're not studded when they're competing, correct? He was able to . . . he was studding Metallic Rebel, I believe, basically when he was starting to compete them. And that's why he was comping and not charging for the stud fees. For the first year, he comped the stud fees, right, or something like that? Majority of it, yes. Wasn't that industry practice that you . . . I mean, they did that with Metallic Cat, maybe? I think Mr. Fultz testified that Metallic Cat was getting $5,000 per stud session right off the bat because he did so well.  Metallic Cat is kind of secretariat in there. But when you say the purpose of the agreement was to have competition horses, that includes breeding those horses as well, correct? Ultimately, yes, but . . . Could that be accomplished in a year? The breeding cycle, no, but that's another purpose. Within the purpose for these horses, and what Mr. Gwynne said was his intent, and he said this twice, he said this at 14-7-24 and 14-7-32, he wanted horses that could win competitions. And Metallic Rebel was able to perform well in competitions basically shortly after he was purchased. Because he was purchased, he'd been trained, he was not on training wheels anymore. He was a full-fledged competition-quality horse at that point in time. I believe Mr. Galyan testified at the trial that Metallic Rebel could not have been an elite breeding horse in 2015 because the stallion had yet to attain the necessary success as of 2016, and he only realized his true competitive potential in 2017. Am I stating that correctly from your recollection? When he maximized his potential, yes, but that doesn't mean he could not have done so. When you buy a horse in 2015, it doesn't mean that he can't win the Futurity or the other two parts of the Cutting Horse Triple Crown within a year. What it's saying is, again, that's looking backwards from what happened in 2017, was Mr. Galyan looking backwards and saying, here's where we are. No, he didn't hit that point then, but he was getting to the point in 2017. But we have to look at the nature of the agreement when the parties entered it, and it wasn't that we would, right out of the gate, to use a bad horse pun, I guess, do all this within a year. In other words, it was a longer-term time horizon. Isn't that relevant? I'm going to ask you about Chase, our recent case from this court, but that seems square up into what Chase requires. We look at the nature of the agreement and what the parties intended at the time they entered the agreement. That is what Chase talks about. And it wasn't that all this would be done. Maybe it could be, but that's theory, not what they intended. Again, that is what Chase talks about, but Chase really goes beyond where Texas law is. Chase is also binding on this court. Chase is binding on this court, but so are the cases that Chase ignored, such as the Floor Trading Company case from 1995 that talked about a much more broad aspect in terms of when a contract could be terminated within a year that would take the case outside of statute of frauds. Chase only really examined cases from this court before it split, when there was no Eleventh Circuit. So it relied upon a Fifth Circuit case from 1978. It relied upon a Texas case from 1977. The Clear Lake Authority case, Clearwater Lake Authority case that talked about building up through a contract with great costs and how long, you know, building up a business through a contract termination and how long it would take. But that Clear Lake case that Chase relied upon heavily, it doesn't have anything to do with statute of frauds. Chase quoted it for statute of frauds, but it didn't have anything to do with it. But what Chase says, analyzing all those cases, old or new, it sounds a lot like what Chase was arguing there is what Galleon is arguing here. He says it's error to look at the intended performance of the agreement rather than the possibility of performance within one year. All that's necessary is the possibility the agreement could have been completed, right? And what Chase says is the case law is a lot more nuanced than that. I'm reading from page 228 of the opinion. Oh, I understand. And I understand the nuanced issue. However, the other nuance that Chase did not have and our case does have is, again, there was the error by the magistrate judge regarding the sale clause. The sale could have occurred, even if it wasn't intended. The sale could have occurred at any point in time that Mr. Gwynn wanted to because he was a 75 percent owner, and that could have occurred within one year. Chase didn't have anything along those lines. That was just a sweat equity where they were building a general business and there was no out clause to it. Yeah, but Chase says when we are looking at the statute of frauds, this is a quote, we may use any reasonably clear method of ascertaining the intended length of performance. Where's the evidence that the intended length of performance when the parties entered this agreement was under a year? That statement by Chase overstates Texas law. But it's quoting a Texas case. That's the clear what leg case that it's quoting. That's Gerstacker. Gerstacker went the other way. Gerstacker actually found the contract was outside the statute of frauds and not within because even if you have intent that basically the way Chase is written and the way Chase is interpreted by Mr. Gwynn is that any time you have an oral contract that you intend may go many, many years, even though it only goes for one or less, that contract is within the statute of frauds. That would bring a lot of contracts within the statute of frauds, which is what the Texas courts have refused to do because they try not to bring cases, contracts within the statute of frauds. Instead, they try to find whether or not the full performance could have been performed within a year as of the time it was started. Here it could have been because the horses could have been sold. That's the conceivability. That's where it is, and that's why this case should have been reversed. Thank you, counsel. You saved time for rebuttal. Yep. Counsel for Mr. Gwynn. May it please the court. We also, I believe, think this case can start and stop with the standard of review and applying this court's recent decision in Chase. In terms of the substantive law, we think Chase got it right. We also think it's controlling, but we do think it's a correct statement of Texas law, and I'm happy to answer the court's questions about that, and I'll cover that as well. And everyone agrees this was an advisory jury question, not entitled to deference, and that the courts, I think, I don't know if there's agreement that the court's embedded findings are entitled to clear deference review or clear error review, but we believe that the findings made by the court in its memorandum, that it's described as findings, are entitled to that clear error review. That's the ones that we've identified in our brief, and those have to do with some of the contract terms that were not asked of the jury. So if I could begin by addressing a couple of things that came up very early in the appellant's argument. There was a suggestion that the jury implicitly found the existence of a term about selling the horse in how it answered the lost profits question. So there was no other discussion of lost profits in the opening. What I'd point out to the court is that was not the question the jury was asked about lost profits. The jury was asked a question about the difference between the amount that Mr. Gallion would have been entitled to under the agreement as opposed to the amount of additional costs he would have expended, and the jury was specifically asked in that question 13 how much of those damages would have been resulting from such breach. So it's referring back to the terms in question 10, and there's no term in there that has to do with selling the horse. So as we submitted an alternate issue, do you think the jury had no sufficient evidence to answer the question the way they did? But the jury was not asked about ownership of the horse in question 10. That was not one of the terms submitted. That's not what the jury found in question 13 that was asking them to find things to a breach of the term. So I heard Counsel Opposite's argument that even if we look to the district court's fact findings under the deferential clear error, there was clear error there because the evidence was corroborated. Mr. Gallion's father said, Mr. Gwynne said, oh, yeah, you know, and validated the sale term. So did the court commit clear error by disregarding some of the record evidence? No, absolutely not. There was evidence supporting the district court's conclusion, and the evidence that is cited from Mr. Gallion's father, Jody Gallion, he backed up what his son said in court. I don't know if that's a remarkable thing or unremarkable thing, but the district court was not required to give credit. It is evidence. If there isn't contrary evidence, it would be clear error to ignore it. There was contrary evidence. So most on point, Mr. Gwynne did not agree with that. Mr. Gwynne denied that he had agreed to that term. He denied that he had agreed to any kind of long-term partnership. He would say at trial, I don't do partnerships. And I can give you some context for what I think Mr. Gwynne understood this relationship to be and where the difference is in the two sides is Mr. Gwynne understood he was hiring a horse trainer. And if you look at that list of supposed contract terms that he would, that Mr. Gallion would train the horse, compete on the horse, they would split the winnings 50-50, all of that is standard for a horse trainer. The twist in this case is that Mr. Gallion contends that in addition to that normal trainer relationship, he was also gifted essentially a 25 percent stake in this horse. And that contention is the difference in the case. And so when Mr. Gwynne testified that he had not agreed to any kind of long-term partnership or arrangement, he was denying the kind of term. So he denied there was a partnership, but did he deny there was a possibility of selling the horses or a sale term? Possibility of selling the horse. Yeah, he said he would never sell the horse. His testimony was direct that he would never do it. There's also other testimony that I think we discussed in our brief that I think corroborates the idea the parties had not agreed to sell the horse, which was testimony about how Mr. Gallion himself was personally attached to the horse. It's apparently a very lovable horse. And Mr. Gallion understood that the person who sold it to Mr. Gwynne had asked Mr. Gwynne or required Mr. Gwynne not to remove it from his training facility. That's from testimony about that. Mr. Fultz. Exactly. And there's testimony from Mr. Fultz about their emotional attachment. There was a contention in the trial as recently as the trial brief that from the appellants, now appellants, that there had been an agreed term that Mr. Gwynne would not sell the horse. And I think the district court points this out, referring to the ECF numbers, but he's referring to a trial brief where their position going into trial was there had been agreement not to sell the horse and that the breach had been removing the horse. But now we have this reverse situation that's unfolded on appeal where it's to their advantage to argue that, in fact, they had contemplated selling the horse. Well, it sure would have been nice to have put this in writing. I think the district court is exactly right. The district court said it also, but I'm saying it as the old lawyer in me. Yes. It probably would have only cost a couple hundred bucks. But, well, let's go to this idea, and you heard counsel opposite say this also, that the contract, regardless of the sale term, could have been performed in a year, and, in fact, it was performed in a year. So we really have to just look at the possibility that it could have been all done in a year, correct? I think the statement in Chase is correct, which is that there's, and the statement in Chase is correct, that there's a general rule that uses terms like conceivable or impossible. But when actually applying it, cases from Texas, including the Texas Supreme Court case, Naday v. Naday, ask the more nuanced question, which is how do we determine what the end point of the contract is? And that's where the Texas cases and the cases from this court try to use evidence to reasonably ascertain when that end point was. So you look to the purpose of the agreement. And the Texas cases are extremely clear that you distinguish between mere termination of the agreement, which is the people can walk away, as opposed to performance of the agreement, which is they got what they had intended to do. So from your view, what was the purpose of the agreement? The purpose of the agreement, as we understand, was alleged to be building a brand of breeding stallions capable of charging high breeding fees. And so as we understood the way it was tried and the way that they alleged it in their trial briefing and have gone through, is that it's about that whole process of building the brand of breeding stallions. And so that purpose stated the way they've stated it and the way the district court found as fact that that was the purpose. It can't be performed within a year. The biology doesn't work that way. The business doesn't work that way. I mean, there's been a suggestion that the horse was biologically capable of procreating, which made it possible to perform. But the partnership wasn't to breed one horse. The partnership was to build a business. And the record is very clear that the business requires training success and the particular business plans, we call it, or with the testimony, Mr. Gallion calls it a breeding plan for this horse, would have required years to unfold, where you have another year of training success, as this horse actually had in 2016. You can see the remarkable success it had in 2016 at Defendant's Exhibit 175. And then in 2017, it started to win Horse of the Year awards, which is when you really can go out and say this is a horse worth using your valuable mare to breed with this horse. And... Back up one moment, please. What you just quoted, the brand, now you say on behalf of your client is, you agree, was to form a partnership for the purpose of building a brand of horses. I mean, the purpose. For building a brand of horses that will be capable of being high-breeding stallions. Are you quoting Mr. Gallion's complaint with the trial court? I am, I was trying to quote what the trial court found as fact, which I think in perm was also citing to the pleading. And it was citing to some of the opening statements and some of the other testimony at trial. But I was trying to cite the finding of the district court. Because his amended complaint says that as well.  At 127. Did you agree it was to build a brand? I agree. That is the partnership claim they brought. And that they have to fit within the statute of frauds. And so... You don't contest there's an oral agreement? Not on appeal, Your Honor. We denied it at trial, but we did not. That's not one of our appellate issues. We did not challenge the existence of the partnership agreement on appeal. You know, we do have a favorable... One of your alternate grounds was there wasn't enough evidence to show that, to substantiate a partnership. You're correct, actually. Yes, for some reason my brain has misprocessed that. Well, so back to the existence of an oral agreement. Yes. The jury found various terms of the agreement, right? And that part of the jury verdict we would owe deference, correct? Yes. So those terms, I mean, the fact that they found the partnership, the fact that they found an oral agreement, and the fact that those terms that are given, that the district court carried forward, if I read it right, we would owe deference to that part of the verdict? I think that's correct. Okay. So your alternate ground that you've now been refreshed on, that there wasn't enough evidence for a partnership, is that at variance with the jury's verdict? Or how do we get there? I mean, I know you walked through the Texas requirements in your brief. Well, it is. It's a Rule 50B motion renewing our Rule 50A at the close of evidence. And what I would say about that is if the court reaches this alternate ground, the court should keep in mind the context within Texas law of this question of is there a partnership. Texas has an entity theory of partnership. So the question the Texas statute's asking is not just did these people agree to do business with each other, but did their agreement form a new business entity? Was their relationship such that the law will recognize the creation of a distinct partnership entity from the nature of this? And that carries through in the cases. The leading Texas case is Ingram v. Deere, where the court gives an extensive analysis of each of the factors and walks through what kinds of evidence is legally significant or legally sufficient for that factor and what kinds of evidence is not. And this isn't just a question of stacking up evidence. It's not what they're trying to do. What they're trying to do is to classify the evidence. Is this the kind of evidence that tends to indicate the formation of a partnership business entity as opposed to just two people doing business with each other, buying and selling their services? And so Ingram walks through each of them. And we cite Ingram perhaps for every factor because it is truly like the Rosetta Stone of seeing how Texas courts apply this, and the federal courts that we cite have also applied it the same way, doing this classification question. And so what you keep in mind about the facts here is that Bo Gallion and the Gallion family had their own separate business entities. Bo Gallion Stallion Station was a separate business entity. Bo Gallion Incorporated, separate business entity. He had other customers. There's some testimony in the record about his other customers. He clearly took steps to further the horses, Metallic and I forgot the other name of the horse. Rolls Royce. Rolls Royce. How can I forget that? With a Z. With a Z. Took steps such as building the stud facility for those horses, correct? That was built for his own company. And this is an important difference that happened at trial as opposed to pretrial. We had a summary judgment process more than a year before trial. It was a long interlude for some special master stuff to happen. But in that summary judgment, he had suggested that was a contribution to the partnership. At trial, he was very clear that it was separate from the partnership. That he didn't want to, and I think I understand why he would say that. He didn't want to be in a trial court saying this company business I've built with the stallion station on my land is 75% owned by the person at the other table. He didn't take that position at trial. His position at trial was that the stallion station was owned by him and his family. It was separate from the partnership. And he might have been motivated by thinking, hey, I've got a good customer on the hook. I can use that to build the brand of my separate company. But that's doing business with somebody who's buying and selling. That's not combining your assets together into a partnership. It might be putting the cart before the horse. Perhaps so, Your Honor. Yeah. Perhaps so. Nay, it's not. And I think the same kind of thought goes to the other kinds of things where he said he put himself at risk where he had employees, but those were employees of his own companies. He made contracts, but there are some of those in the record. Those were contracts made with his companies. So none of that shows a partnership. And what was remarkable at trial was there was not even the internal records of Bo Gallion or his companies showed the existence of a partnership. There was just nothing in writing. And we recognize we have an adverse jury verdict on that. But in terms of when you're looking at it, there's nothing that looks like a formation of a partnership. Remind me, under Ingram or Texas law, do we have to meet each factor or is it sort of a weighing thing? The way it's described is its totality. There are cases that say one is generally not enough. Scant evidence of two may not be enough. Yeah. So I'm just wondering, the jury's findings about what the contract was, and he did get payments, right, the 25 percent? They were 50 percent fees paid. And the testimony is clear that that was off the gross, not the net profit of the business. And that's one of the key points made in Ingram. Yeah. I'm just wondering, are the jury's findings and the fact that there was payments back and forth and what have you, is that enough? I don't think it's enough because those payments in particular are gross revenue, and it's very clear from the record that's gross revenue. And Ingram is very clear that that's not evidence that would tend to form the separate partnership entity. The idea would be that a partner's going to get net revenue. They're going to get net after not just some expenses, but all the expenses of the business. So the statute describes it as profit of the business, and that's what Ingram talks about as well. And so this is our more difficult of the two alternative grounds because we do have the jury finding about this, and you have to look at the evidence very carefully. I think if you were to go through that, you would determine that the specific things they've cited are really described by Ingram as being not things that favor the creation of a partnership entity. One of the most dramatic may be he's pointed to his reputation and said that he contributed that to the partnership, but the record of trial was he didn't tell anybody he was a partner. He testified he hid that from the world. I mean, that's not contributing your reputation to a partnership. But I'm not sure if I should address the lost profit ground. I think maybe I will for just a moment unless the Court has another question about partnership. We do think this is an independent way you could affirm the judgment because the only claim that survived was the breach of contract claim. The jury was asked about breach of fiduciary duty, and this is important. Section 1 of the jury charge is asking about fiduciary duty. The jury is instructed about the nature of those duties, and it includes duties about handling partnership property, including when you're winding up the partnership. And it's talking about the duty of care, duty of loyalty. The jury was asked to determine was there a breach about handling property of the partnership or some breach. They were asked that question in Question 4, was there a breach of fiduciary duty, and the jury answered no. So we think we have a jury verdict in our favor that there was not mishandling of partnership property. The jury answered no. And the jury's answer about the contract terms we think is limited to the scope of what those terms are in the instructions, which don't have to do with selling the horse or never selling the horse. And we think the district court's analysis of that is correct. But if you just look at the jury charge itself, it doesn't have that as part of the instruction to the jury about what they're supposed to award. So in the appellant's brief, we have this argument that, in fact, this wasn't really profit. This was what Bogallion expected he would have gotten if there had been a dissolution or termination of the partnership through some sort of mechanism of Texas partnership law. It's clearly not what the jury was being asked at the time. We've pointed out some Texas cases that distinguish it substantively. I'd also point out that after this verdict, the appellant also asked for an expansion of the declaratory judgment they were seeking in this case. They asked the district court to analyze these same partnership statutes and award as a declaratory judgment this amount for partnership dissolution. And the district court rejected that argument. It ruled against them. And so in this court, you have no appeal by the appellant of this adverse finding of fiduciary duty, no appeal of this adverse judgment by the district court on their request to get this through declaratory judgment. And they're trying to shoehorn that in by saying that's really lost profits all along. But that's inconsistent with Texas law. And it's also inconsistent with a really fundamental principle of Texas law in a case that we discussed called puriflow, which is that Texas does not award future loss profits for a terminable at will agreement that everybody agrees is over or ending soon. In puriflow, the party went into court and said we successfully terminated it. And the jury disagreed. But the Supreme Court ultimately held that that intention to terminate meant there was not legally sufficient evidence of some future amount of profit. And in our case, everybody agrees there was no business relationship after 2021. It's extraordinarily clear here there was not going to be an ongoing business relationship. So even if they try to recharacterize something here as being about some future profits, it's not future loss profits and breach of contract. And they had a conversion claim directly about property that they dropped. They lost the fiduciary duty claim. They lost their attempt to get it through declaratory judgment. And we'd ask the court to reject their attempt to try to shoehorn that back in through a lost profits finding that the jury here was not asked to make. So we ask the court to affirm. Thank you, counsel. We have your argument. Rebuttal. He mentioned, Appellee's counsel mentioned the Nide case. And that is one of the various cases that we've talked about. It's the Texas Supreme Court. We talked about that in our brief. We talked about these concepts. There's that one and there's the one that dealt with Southern Methodist University. These are contracts that were made. And as of the day they were made, they could not be done within a year. They're oral contracts. The Nide included two sets of licensing that the plaintiff was going to need to complete. Each set had to be done separately and would take about a year. The SMU case dealt with somebody who was promised a scholarship in May. The years are going to escape me, so I'll say May 2000 and wasn't going to matriculate until September 2001. And claimed that there was an oral contract that was more than a year apart. So those were obviously not performable within a year. This was performable within a year because the horses could have been sold. There may have been no intent to sell, but there's never an intent to breach a contract either. And contracts get breached. Can you address your opposing counsel's argument where I think he was quoting your amended complaint that said what you allege the purpose of the partnership was to build a brand of horses that will ultimately be capable of earning high breeding standing fees and will be split between the partners. I'm reading from your amended complaint. Can you build that brand within a year? You can build a brand based on the performance of the stallions who are going to stand stud and their performance within, for lack of a better word, the ring. And once that brand gets out, then that can be built within a year. However, if it's terminated by sale of the horses or another unfortunate event, that's not a termination whereby the contract merely just terminates. That's a termination with performance because you are building that brand. And if you're not breaching it, which there's no finding at all that Mr. Gallion breached, that he complied with the agreement, then that's termination with performance. And so that's conceivable within a year. If we disagree with you that the sale of the horse was a part of the contract, is that fatal to your statute of frauds claim? I don't think that it is because the contract, as stated by the jury, with the specific clauses of 50 percent earnings, 25 percent stud fees, that can be performed within a year, and then somebody just terminates the agreement. It's like an agreement that's for good performance. All of a sudden, Mr. Gwin doesn't like how Mr. Gallion's doing one thing or another, but Mr. Gallion didn't breach. He terminates it within a year, or he can terminate it at any time because he's a 75 percent owner. He can take the horses back. If he took the horses back in May of 2016 instead of July of 2021, then it would be fully enforceable because it would be less than a year. One quick statement about these contentions at the agreed terms that Gwin would never sell, they'd keep the horses, they'd love the horse. Yeah, the horse is great. Metallic Rebel is a great horse, and he's got a wonderful web page you can go look at. It's metallicrebel.com. But the fact is that there's no contract that the parties enter with the intent or the belief that it's going to be breached. The jury found a partnership. The jury found that the horses were property of the partnership. Those were questions one and three. We can't take that away from Mr. Gallion without some recompense, and we don't think this is within the statute of frauds. Thank you, Your Honor. Counsel. Are we excused? Yes. Thank you, Counsel. We have no arguments. These cases are submitted, and the court will be in recess until tomorrow at 9 a.m.